1
2
3
4
5
6
7
8 UNITED STATES DISTRICT COURT

9 EASTERN DISTRICT OF CALIFORNIA

10

11 SHERRILL LYNN EILERS,                    No. 1:18-cv-00109-GSA

12          Petitioner,

13      v.                                  **ORDER DIRECTING ENTRY OF
                                            JUDGMENT IN FAVOR OF**
14 NANCY A. BERRYHILL, Acting               **COMMISSIONER OF SOCIAL SECURITY**
   Commissioner of Social Security,         **AND AGAINST PLAINTIFF**
15
16          Respondent.

17

18

19
20      **I.      Introduction**

21          Plaintiff Sherrill Lynn Eilers ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

23 disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is

24 currently before the Court on the parties' briefs which were submitted without oral argument to

25 the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 13, 14 and 15.  Having

26 reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial

27 evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

28
---
[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 6 and 7.

## II.     Procedural Background

On March 31, 2010, Plaintiff filed a previous application for disability insurance benefits and supplemental security income alleging disability beginning June 1, 2009.  AR 30.  In a hearing decision dated December 22, 2011, an ALJ found that Plaintiff retained the residual functional capacity to perform light work, and that jobs that Plaintiff could perform were available in the national economy.  AR 30.  Accordingly, the ALJ determined that Plaintiff was not disabled.  AR 30.

On June 27, 2013, Plaintiff filed the pending application for disability insurance benefits alleging disability beginning December 23, 2011.  AR 30.  The Commissioner denied the application initially on October 15, 2013, and upon reconsideration on February 28, 2014.  AR 30.  On April 29, 2014, Plaintiff filed a timely request for a hearing before an Administrative Law Judge.  AR 30.

Administrative Law Judge John Heyer presided over an administrative hearing on June 28, 2016.  AR 49-128.  Plaintiff appeared with the assistance of a representative who was not an attorney.  AR 49.  Impartial vocational expert Thomas Reed (the "VE") also testified.  AR 49.

On August 16, 2016, the ALJ denied Plaintiff's application.  AR 30-43.  The Appeals Council denied review on November 22, 2017.  AR 4-9.  On January 22, 2018, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.     Factual Background[2]

### A.     Plaintiff's Testimony and Reports

Plaintiff (born June 1, 1965) last worked as a nursing assistant from 2005 to 2011, when she was discharged from her job.  AR 52, 64.  Plaintiff stopped working because she hurt her back while turning a patient.  AR 54.  In the fifteen years before applying for disability benefits, Plaintiff also worked as a security guard, a manager of a retail garden department, a retail salesperson, a temporary warehouse worker, a motel maid, a fast food restaurant cashier and a school crossing guard.  AR 53-54.  Plaintiff ended school in ninth grade.  AR 61.

---

[2] Although the transcript of the October 2011 hearing and other evidence relating to Plaintiff's 2010 applications are included in the administrative record, these materials are not summarized in the factual background unless they are necessary to understand procedures or evidence related to the current applications that are the subject of this decision.

Plaintiff testified that she had severe headaches, neck pain, neuropathy in her hands and feet, lower back pain that radiated to her legs, and shoulder pain from her prior surgery and a recently torn rotator cuff.  AR 66-67.  Because of her financial stress and pain, her blood sugar was always too high.  AR 316.  She had difficulty sleeping.  AR 317.  The nerves in her legs were deteriorating and caused her to fall.  AR 67.  She had trouble remembering as a result of a brain tumor.  AR 68.  Plaintiff always used a cane, as recommended by Dr. Chan.  AR 68.  Numbness in her hands caused her to drop things.  AR 69.  Because of her pain, Plaintiff slept only about four hours daily and constantly felt fatigued.  AR 64.  Plaintiff had back surgery in 2008 and shoulder surgery in 2009.  AR 61.

Plaintiff's medications included Zocor (cholesterol), Lisinopril (blood pressure), Prilosec (stomach), Neurontin (nerve pain and diabetic neuropathy), Xanax (panic attacks), Norco (pain), Percocet (pain), Soma (muscle relaxer), and Ditropan (bladder leakage).[3]  AR 59.  On the hearing date, Plaintiff was taking antibiotics following dental work that would not heal.  AR 59.  She also relieved pain using a heating pad and a TENS unit.  AR 63.

She could lift no more than five pounds, stand for about fifteen minutes at a time, and sit about twenty minutes before needing to stand.  AR 54-56.  Her ability to lift her right arm and to reach was limited.  AR 55, 69.  She could walk around the block.  AR 55.  She elevated her legs while resting because diabetes caused her feet to swell.  AR 62.  In an average week, Plaintiff stayed in bed three days.  AR 65.

On a typical day Plaintiff first tested her blood sugar and administered insulin if needed.  AR 56.  She ate when she was supposed to.  AR 56. She watched television and read but did not use a computer.  AR 58.  She was not able to sew or embroider because her hands became numb.  AR 58-59.

Plaintiff's daughter helped her with errands, such as picking up medications and shopping.  AR 56.  Plaintiff's sons and husband shared household chores such as laundry, cooking, making the beds and doing the house cleaning.  AR 56.  Plaintiff's daughter assisted Plaintiff with getting

---

[3] Plaintiff testified that she was supposed to take Percocet only as a backup when the Norco was not effective.  AR 60.  Nonetheless, she was taking both medications four times daily because of her continual severe pain.  AR 60.

in and out of the shower and washing and braiding her hair.  AR 56.  Plaintiff tried to walk as her doctor directed, but found walking very difficult.  AR 56.

### B. Third Party Adult Function Report

Plaintiff's adult son Patrick Eilers, who lived in Plaintiff's home, filed a third-party adult function report dated August 13, 2013.  AR 307-15.  He reported that Plaintiff experienced neck, back and foot pain even when she took her medications, and had poor memory because of her brain tumor.  AR 307.  Plaintiff had difficulty lifting, squatting, bending, standing reaching, walking, sitting, kneeling, stair climbing, remembering, completing tasks, concentrating, following instructions and using her hands.  AR 312.  Plaintiff required help from her sister or daughter to perform all personal care activities.  AR 308.

Mr. Eilers disclosed that the family did not allow Plaintiff to do household or yard work because she was prone to "black outs" that resulted from her injuries and brain tumor.  AR 310.  Plaintiff shopped for personal items with her sister for twenty minutes once or twice a month.  AR 310.  Otherwise, Plaintiff did not go outside except for doctors' appointments.  AR 310, 311, 312.  Plaintiff's husband and sister handled all of Plaintiff's financial affairs.  AR 310.

### C. Medical Records

In 2005, Plaintiff injured her lower back while lifting a patient at work.  AR 544.  On January 16, 2009, Plaintiff injured her right shoulder while lifting a patient at work.  AR 544.

#### 1. Primary Care: Dr. Warsaw

Terry J. Warsaw, M.D., was Plaintiff's primary care physician.[4]  Dr. Warsaw's treatment of Plaintiff focused on her diabetes, particularly her chronically high blood sugar and hemoglobin A1C levels, and noted her high blood pressure.  AR 405-23, 437-38, 582-91.  Much of Plaintiff's treatment in 2012 focused on stabilizing her blood glucose by adjusting insulin dosages and administration times.  AR 405-23.  Dr. Warsaw repeatedly encouraged Plaintiff to stretch gently, exercise, eat a healthy diet and reduce her portions.  AR 435, 582, 585, 788.  In February 2013, the doctor diagnosed diabetes, arthritis and right shoulder pain.  AR 434.  In August 2013,

---

[4] Dr. Warsaw's handwritten treatment notes are sometimes difficult to decipher, or too incomplete to communicate clearly.

Plaintiff's blood glucose levels had improved but Neurontin[5] was not helping her much.  AR 440.
In April 2014, Dr. Warsaw noted that Plaintiff was restricting her activity because of back,
shoulder and neck pain.  AR 607.

In January 2016, Plaintiff advised Dr. Warsaw that workers' compensation would no
longer pay for her Soma prescription and she would have to begin to pay out-of-pocket.  AR 789.
Dr. Warsaw issued a Soma prescription.  AR 789.

## 2.    Pain Management: Dr. Chan

Beginning September 17, 2010, Samuel Chan, M.D., J.D., provided pain management
treatment pursuant to workers' compensation coverage of Plaintiff's on-the job injuries.  AR 444.
After examining Plaintiff on December 28, 2012, Dr. Chan diagnosed a right shoulder rotator cuff
tear and lumbar spine radiculopathy.  AR 445.  He directed Plaintiff to continue taking Prilosec,
Percocet,[6] Lortab[7] and Soma.[8]  AR 446.  The record includes substantially similar workers'
compensation reports of monthly examinations in January, March, April, May, June, August,
September, October November and December 2013; January, March, April, May, June, August,
October, November and December 2014; January, February, March, April, July, September 2015.
AR 444-69, 540-43, 561-68; 570-78, 657-718, 730-39, 858-61, 992-96.  With few exceptions, the
reports only differ significantly in the doctor's summary of Plaintiff's reported symptoms since
her last examination.

According to Dr. Chan's May 2015 report, Plaintiff reported that she had been injured in a
fall, injuring her hip, right elbow, right foot and ankle, and face.  AR 720.  She lost several teeth.

[5] Neurontin (Gabapentin) is an anticonvulsant sometimes prescribed to relieve the pain of diabetic neuropathy (numbness or tingling due to nerve damage in persons with diabetes). www.medlineplus.gov/druginfo/meds/a694007.html (accessed June 5, 2019).
[6] Percocet is an extended-release opiate analgesic comprised of oxycodone and acetaminophen prescribed for moderate-to-severe pain.  Because it may be habit forming and interact unfavorably with multiple types of other drugs, it must be taken only as prescribed.  www.medlineplus.gov/druginfo/meds/a682132.html (accessed June 5, 2019).
[7] At various times, Plaintiff took various branded hydrocodone and acetaminophen combination drugs including Lorcet, Lortab, Norco and Vicodin.  These opiate analgesics are prescribed to relieve moderate-to-severe pain. Because these products can be habit forming and may interact unfavorably with multiple other types of medications, they should be taken exactly as prescribed by the patient's doctor. www.medlineplus.gov/druginfor/meds/a601009.html (accessed June 5, 2019).
[8] Soma (Carisoprodol) is a muscle relaxant used with rest, physical therapy and other treatment to relax muscles and relieve pain caused by sprains, strains and other muscle injuries. www.medlineplus.gov/druginfo/meds/a682578.html (accessed June 5, 2019).

AR 720.  Dr. Chan referred Plaintiff to Dr. Price for a right shoulder consultation and ordered a "[c]omprehensive qualitative urine drug screen to evaluated for medication management/pain management therapy per ACOEM/MTUS/ODG Guidelines."  AR 720.  In June 2015, Plaintiff reported that she injured her right knee on May 31, 2015.  AR 726.

In October 2015, Dr. Chan modified his listing of Plaintiff's current medications to specify that Plaintiff was to use her prescribed Hydrocodone for "breakthrough" or "rescue" pain only.  AR 742.  The report stated that the Hydrocodone prescription was intended to enable Plaintiff to maintain her activities of daily living by allowing her to tolerate severe pain attributable to exercise or other increased levels of activity.  AR 742.  Dr. Chan continued to incorporate this restriction of Plaintiff's use of Hydrocodone in reports dated November and December 2015, and January and February 2016.  AR 746-75.

### 3.  Magnetic Resonance Imaging Reports

In May 2014, radiologist Harris Newmark, III, M.D., evaluated a series of magnetic resonance images of Plaintiff's right shoulder, lumbosacral and cervical spine.  AR 601-05.  Dr. Newmark observed lumbar discogenic and degenerative changes including a 3-4 mm disc bulge or herniation at L5-S1 with "at least moderate spinal stenosis," and a 2 mm disc bulge with narrowing of the spina foramina and mild spinal stenosis at L4-5.  AR 605.  The cervical images revealed possible overall degenerative changes, a 3 mm disc bilge at C6-7 associated with mild to moderate spinal stenosis, a 1-2 mm disc bulge at C5-6 with mild to moderate spinal stenosis, and 1 mm disc bulges at C3-4 and C4-5 with mild spinal stenosis.  AR 604.  Because Plaintiff's shoulder surgery produced artifacts in the images, drawing an impression from the shoulder image was inexact.  AR 602.  Dr. Newmark observed multiple mild degenerative changes and recommended clinical observation to rule our tendonitis or a partial tear.  AR 602.

### 4.  Emergency Room Treatment

In January 2012, Michael Santillanes, M.D., treated Plaintiff in the emergency room of Tehachapi Valley Healthcare District (TVHD) hospital.  AR 642. Plaintiff reported that her body ached all over and that she had run out of Lorcet, Percocet and Soma three days earlier.  AR 642,

646. Emergency personnel administered morphine, Ativan,[9] Zofran,[10] Insulin and Dilaudid.[11] AR 647.

In June 2012, the TVHD emergency department treated Plaintiff for high blood sugar and headache. AR 640-41.

When Plaintiff went to the TVHD emergency room in July 2012, she complained of "pain all over" and claimed to have been unsuccessful in securing a refill prescription from her physician in Long Beach.[12] AR 633. Emergency room physician Ali Vikili, M.D. gave Plaintiff a limited refill of Percocet and Soma. AR 633.

In August 2012, Plaintiff went to the emergency room complaining of abdominal pain. AR 627. Gregory Crawford, M.D., was unable to identify any specific abdominal illness but diagnosed bronchitis and prescribed antibiotics. AR 627-28. In the course of treatment, Plaintiff felt better and complained of back pain. AR 627. "She was given Vicodin and continue[d] to feel well." AR 627.

In February 2013, Plaintiff again went to the TVHD emergency room, complaining of pain "all over" and reporting that she had run out of pain medication but could not see her doctor because of the snow. AR 623. When Dr. Vikili told Plaintiff that the emergency department would not give her narcotic pain relievers because of her history of "drug-seeking behavior at TVHD," Plaintiff called Dr. Vikili a "jerk" and departed without treatment. AR 623.

In May 2013, Plaintiff went to the TBHD emergency room complaining of not feeling well since she ran out of Percocet and Norco four days earlier. AR 618-19. Dr. Vikili refused to give Plaintiff the narcotic medications she requested and offered Plaintiff four Vicodin for pain relief until she could see her doctor. AR 618-19. After demanding a shot and calling Dr. Vikili "nasty," Plaintiff left the emergency room without waiting for an examination or the Vicodin prescription. AR 619. Dr. Vikili noted that he had previously encountered Plaintiff demanding

---

[9] Ativan (Lorazepam) is a benzodiazepine used to relieve anxiety.
www.medlineplus.gov/druginfo/meds/a682053.html (accessed June 7, 2019).
[10] Zofran (Ondansetron) is used to prevent nausea and vomiting.
www.medlineplus.gov/druginfo/meds/a601209.html (accessed June 7, 2019).
[11] Dilaudid (hydromorphone) is an opiate analgesic used to treat pain.
www.medlineplus.gov/druginfo/meds/a601148.html (accessed June 7, 2019).
[12] Dr. Chan's main office was then located in Long Beach, California.

narcotics in the emergency room and characterized the incident a "drug-seeking behavior." AR 619.

In June 2015, Plaintiff went to TVHD emergency room, complaining of right knee pain that occurred after she twisted it while standing up eleven days earlier. AR 614-17. After ruling out a Baker cyst and deep vein thrombosis, medical personnel diagnosed a strain, applied an Ace bandage and sent Plaintiff home on crutches. AR 614.

In October 2015, Plaintiff was treated by Ronald Todd Peterson, D.O., in the emergency department of San Joaquin Hospital, Bakersfield, California. AR 793-813. Plaintiff reported that she had experienced left-sided weakness for the past week. AR 797. She denied trauma, neck or back pain, headache, chest pain and shortness of breath. AR 797. Dr. Peterson diagnosed chronic pain syndrome, noting that Plaintiff was dependent of Soma and Percocet. AR 797, 800. Plaintiff's condition was stable throughout the examination. AR 799. Extensive examination and testing revealed no obvious focal weakness, no acute infarction or intracranial hemorrhage, no cranial or spinal abnormality, and only mild degenerative changes to the cervical spine. AR 799-800. Dr. Peterson diagnosed Plaintiff's weakness and paresthesia to be of uncertain significance and discharged her. AR 800.

### 5. Tehachapi Family Health Center: Dr. Apicella

In August 2015, Plaintiff saw Dr. Barbara Apicella at Tehachapi Family Health Center (TFHC) and complained of right knee pain since May 31, 2015. AR 611-13. After Plaintiff declined to select THFC as her primary care physician and authorize a release of records from Dr. Warsaw, she left TFHC without treatment. AR 612.

### IV. Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability

status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are

medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

In addition, when an applicant has one or more previous denials of applications for disability benefits, as Plaintiff does in this case, he or she must overcome a presumption of nondisability. The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied to administrative proceedings than in court. *Chavez v. Bowen,* 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen,* 844 F.2d 664, 666 (9th Cir. 1988).

Social Security Acquiescence Ruling ("SSR") 97–4(9), adopting *Chavez,* applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled. A previous final determination of nondisability creates a presumption of continuing nondisability in the unadjudicated period. *Lester v. Chater,* 81 F.3d 821, 827 (9th Cir. 1995). The presumption may be overcome by a showing of changed circumstances, such as new and material changes to the claimant's RFC, age, education, or work experience. *Id.* at 827–28; *Chavez,* 844 F.2d at 693.

**VI.     Summary of the ALJ's Decision**

The ALJ first determined that Plaintiff had overcome the *Chavez* presumption of continuing nondisability because the passage of time resulted in her being in a new age category. AR 33.  Then, using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 33-43.

The ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of December 23, 2011, through her date last insured of December 31, 2014. AR 33.  Her severe impairments included right shoulder and lower back abnormalities and obesity.  AR 34.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).  AR 36-37.

The ALJ concluded that Plaintiff had the residual functional capacity perform light work as defined in 20 C.F.R. 404.1567(b) except for the following limitations: can lift twenty pounds; complete an eight hour work day if given the option to alternate between sitting and standing as needed in 30 minute intervals; has frequent but not constant use of the hands and upper extremities; can use the right extremity for reaching straight in front or lower but cannot reach above the shoulder; and can do occasional bending and stooping. AR 37.

Plaintiff was not able to perform any past relevant work. AR 41. However, jobs that Plaintiff could perform existed in significant numbers in the national economy. AR 42. Accordingly, the ALJ found that Plaintiff was not disabled from December 23, 2011, through December 31, 2014 (the date last insured). AR 43.

**VII.** **The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Pain Testimony**

Plaintiff contends that substantial evidence did not support the ALJ's determination that Plaintiff lacked credibility. Defendant counters that the ALJ appropriately rejected Plaintiff's testimony as inconsistent with medical records. After reviewing the record as a whole in light of applicable law, the Court finds that sufficient evidence supports the ALJ's conclusion. Even if the Court could have interpreted the evidence differently, because evidence in the record could reasonably support either outcome, Defendant's interpretation must stand. *See Flaten v. Sec'y, Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). To determine whether the ALJ's findings are supported by substantial evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL

5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. *See also* Social Security Ruling 16-3p Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 at *3 (2017) ("SSR 16-3p") ("In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, we do not consider whether the severity of the individual's symptoms is supported by the objective medical evidence."). In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 31. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if she makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. It is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her

limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair*, 885 F.2d at 602). *See also Bunnell*, 947 F.2d at 34 (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* at 345 (internal quotation marks and citations omitted).

Nonetheless, the law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly considers whether the medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence").

In assessing the claimant's credibility, the ALJ may also use "ordinary techniques of credibility evaluation," considering factors such a lack of cooperation during consultative examinations, a tendency to exaggerate, inconsistent statements, an unexplained failure to seek treatment, inconsistencies between the testimony and conduct, and inconsistencies between daily activities and the alleged symptoms. *Tonapetyan,* 242 F.3d at 6; *also see Smolen*, 80 F.3d at 1284; *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (including as factors claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties about the nature, severity, and effect of the alleged disabling symptoms). In addition to objective medical evidence, the ALJ

must consider (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the alleged pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of prescribed pain medication; (5) pain relief treatments other than medication; other methods used to relieve pain; and (6) other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. §§ 404.1529(c), 416.929(c).

"If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958. "[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." *Bunnell*, 947 F.2d at 346. On the other hand, if the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

Using Defendant's boilerplate language, the ALJ first wrote that although Plaintiff's medical impairments could reasonably be expected to cause the symptoms alleged, Plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR 38. The ALJ then analyzed the medical record in detail. AR 38-41.

In the course of summarizing the medical records included in the administrative record, the ALJ observed numerous inconsistencies between Plaintiff's representation of her symptoms, diagnoses and treatment, and the medical records addressing the same symptoms, diagnoses and treatment. Evidence in the record supports the ALJ's analysis. For example, magnetic resonance images of of Plaintiff's right shoulder (AR 602) and spine (AR 603-04, 800, 807) revealed mild degenerative changes likely to produce some limitations in work activities but did not support the severe limitations that Plaintiff alleged. AR 38. Plaintiff testified that she needed to lie down and elevate her legs above her heart because diabetes made them swell (AR 62), but the only time elevation is mentioned in the record is in Dr. Chan's April 2, 2016 opinion (AR 817) which

indicated that Plaintiff needed to elevate her legs no more than six inches while sitting. AR 38. Plaintiff alleged that she could not concentrate (AR 68, 321,) but Dr. Schmidt opined that Plaintiff's attention and concentration were within normal limits (AR 548). AR 38. In addition Plaintiff herself testified that she was able to read and watch television. AR 58. Plaintiff reported having good days and bad days (AR 65); Dr. Chan said Plaintiff's impairments would not produce good days and bad days (AR 430). AR 38.

Similarly, Dr. Bhangoo questioned the veracity of Plaintiff's alleged impairments and suggested that Plaintiff was exaggerating her pain. AR 39. Dr. Bhangoo also observed Plaintiff's unwillingness to participate in portions of the examination intended to determine the extent of her impairment:

> The claimant comes into the examination room without any difficulty. She moves around well. [S]he is able to get in and out of chair and climb up on the examination table although she does not use her right arm to support her weight. She is noted to be bending from her back and does not appear to be in any pain.

AR 552.

> The claimant's stati[o]n is normal with eyes open and closed. Gait is slightly antalgic. She fears the right leg and refuses to do tiptoe and heel walking. She refuses to bend down and touch her toes.

AR 553.

> Examination of range of motion was somewhat difficult, as the claimant refused to do most of the range of motion activities.

AR 553.

The doctor added that Plaintiff did not exhibit the muscle atrophy that would be present if she was not using her right arm. AR 554. He characterized Plaintiff's representations as having "an element of dramatization" evident in expressed pain that was disproportionate to the attempted range of motion. AR 554.

The ALJ also noted inconsistencies in Plaintiff's own accounts of her condition. When examined by Dr. Schmidt, Plaintiff reported that she could cook, manage her own personal hygiene, and perform light household chores. AR 39. On the same day, Plaintiff told Dr. Bhangoo that her sister, husband and son helped Plaintiff with household work and personal care

15

(AR 551). AR 39. In her hearing testimony and adult function report, Plaintiff claimed very limited activities of daily living, most of which required help from one or more family members (AR 56, 317-19). AR 39.

Finally, Plaintiff objects to the ALJ's consideration of emergency room reports of drug-seeking behavior:

> [C]laimant's health care providers have noted drug-seeking behavior on the claimant's part, suggesting that she is taking pain medication for purposes other than relieving pain. The claimant was seen in the emergency room on May 28 [2015] requesting a refill of her opiate pain medication, which she received along with a prescription that would allow her to obtain more medication. However, the day after that, the claimant returned to the emergency room seeking further opiate medication, and then left without being examined after being told she would not get narcotic pain medication. Claimant demonstrate the same behavior in July 2012 and February 2013. These emergency room reports suggest that the claimant may be taking narcotic medication for reasons other than pain alleviation.

AR 39 (citations to administrative exhibits omitted).

The administrative record fully supports the ALJ's findings. *See* AR 614-17, 618-19, 623. Additional evidence that the ALJ did not cite further supports his findings. *See* AR 611-613 (Plaintiff attempted to secure treatment at a local clinic for the same knee pain previously reported in the emergency room and left without treatment when informed that MediCal-covered treatment could be provided only if Plaintiff transferred care from Dr. Warsaw to the clinic and authorized release of her records); 793-813 (after Plaintiff sought care for left-sided weakness at the emergency room of a hospital that she had not previously used, the emergency room physician was unable to find any explanation for the claimed weakness and paresthesia, but diagnosed chronic pain syndrome and Soma- and Percocet-dependence); AR 748, 754, 760, 766, 772, 789 (although Dr. Chan prescribed through workers' compensation five times from the beginning of November 2015 through the end of February 2016, Plaintiff secured a Soma prescription from Dr. Warsaw in January 2016 by representing that workers' compensation no longer paid for her Soma). Plaintiff herself acknowledged taking the Hydrocodone that Dr. Chan prescribed, which was to be used only for breakthrough pain on a regular basis, but Plaintiff used Hydrocodone four times daily on a regular basis. *See* AR 60, 742, 746-75.

16

The hearing decision sets forth abundant evidence in the record to support the ALJ's determination that Plaintiff's representations to the agency were not fully credible. The Court will not second guess the ALJ's assessment of Plaintiff's credibility.

## VIII. The ALJ Properly Analyzed Medical Evidence in the Record to Determine Plaintiff's Residual Functional Capacity

Plaintiff contends that the ALJ erred by formulating her residual functional capacity by relying on the opinion of Dr. Bhangoo, a consulting physician, rather than the opinion of Dr. Chan, who treated Plaintiff for many years. Emphasizing that an ALJ's reliance on a treating physician's opinion is conditioned on consistency and support in the record, the Commissioner responds that the ALJ properly relied on Dr. Bhangoo's opinion in determining Plaintiff's residual functional capacity. The Court agrees with the Commissioner that the ALJ did not err in analyzing the medical evidence to determine Plaintiff's residual functional capacity.

### A. Medical Opinions

#### 1. Agency Physicians

Agency physician R. Betcher, M.D., found no change in Plaintiff's medical condition since the denial of her 2010 application for benefits. AR 165. Accordingly, he opined that the agency should adopt the prior denial of benefits. AR 165. Dr. Betcher determined that Plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for four hours and sit for six hours in a normal workday. AR 167-68. Plaintiff could stand for 45 minutes and walk for 30 minutes before sitting briefly. AR 168. Plaintiff had unlimited ability to balance; could climb ramps or stairs, stoop, kneel or crouch occasionally; and, could never crawl or climb ladders, ropes or scaffolds. AR 168. She had limited ability to reach overhead with her right arm. AR 168. Plaintiff should avoid unprotected heights and concentrated exposure to extreme cold and vibration. AR 169. On reconsideration, J. Frankel, M.D., agreed with Dr. Betcher's opinion of Plaintiff's residual functional capacity. AR 184-86.

Finding that Plaintiff's "dramatization" of her condition conflicted with the objective medical records, Dr. Betcher also opined that Plaintiff was not credible. AR 165. When Plaintiff

17

was examined she had no trouble bending to put on her shoes or getting up onto the examining table.  AR 165.  Plaintiff complained that the range of motion of her neck and back was limited but refused to attempt the requested range of motion movements.  AR 165.  Finally, her claim of a brain tumor was not supported by medical records.  AR 165.

Following application of the psychiatric review technique, R. Paxton, M.D., opined that Plaintiff had an affective disorder that did not precisely satisfy the criteria of Listing 12.04.  AR 166.  On reconsideration, Mark Dilger, M.D., agreed with Dr. Paxton's opinion.  AR 182-83.  Plaintiff does not contend that the ALJ erred in concluding that Plaintiff did not have a severe psychological impairment.

### 2. Dr. Chan

#### a. September 2012

Beginning on September 17, 2010, Samuel Chan, M.D., provided monthly workers' compensation treatment following Plaintiff's on-the-job injury.  *See* AR 356-401.  On September 7, 2012, Dr. Chan issued a letter "to whom it may concern" stating that Plaintiff was "totally disabled from 1/6/09 to present and will continue to be disabled for the foreseeable future."  AR 403.

#### b. April 2013

On April 16, 2013, Dr. Chan completed a Spinal Impairment Questionnaire at the request of Plaintiff's counsel.  AR 425-31.  Dr. Chan diagnosed (1) cervical and lumbar sprain/strain; (2) cervical radiculopathy; and (3) lumbar spine radiculopathy/right shoulder cuff.[13]  AR 425.  Plaintiff's symptoms included constant neck throbbing and back, leg and ankle pain; aching of both shoulders; insomnia; stress; anxiety attacks; and, constant head ache.  AR 427-28.  Plaintiff's depression, stress and anxiety contributed to the severity of her symptoms and functional limitations.  AR 429.  The doctor reported a limited range of motion of Plaintiff's cervical and lumbar spine, but did not detail the degree of the reduced range of motion.  AR 425.  He noted muscle spasm and occasional swelling of both hands and feet, and the right leg.  AR 426.

---

[13] The doctor's response, which appears to have been continued on the back of the questionnaire, is not fully reproduced.  AR 425.

18

Nonetheless, Plaintiff was able to completely relieve her pain with medication without any unacceptable side effect. AR 428. Her medications included Prilosec, Norco, Percocet and Soma. AR 429.

In Dr. Chan's opinion, Plaintiff could occasionally lift and carry zero to five pounds. AR 428. She could sit, stand, or walk less than one hour in an eight-hour work day. AE 428. She needed to get up and walk at least every thirty minutes and would need to change position about every fifteen minutes. AR 428, 430. Additional limitations included psychological limitations; need to avoid wetness, humidity and extreme temperatures; and limited vision. AR 431. Plaintiff should not push, pull, kneel bend or stoop. AR 431.

Dr. Chan opined that Plaintiff was tolerant and patient and could perform low stress work. AR 430. Her condition would not interfere with her ability to maintain the constant positioning needed to look at a computer screen or a desk top. AR 430. Plaintiff would not experience "good days" and "bad days." AR 430.

### c. **April 2016**

Dr. Chan diagnosed cervical and lumbar sprain/strain, cervical radiculopathy and lumbar radiculopathy which caused constant, severe pain. AR 814. The doctor reported a limited range of motion at L1-5 and C2-7 and sensory loss in both hands, the right lateral thigh and both plantar areas as well as reflex changes and bilateral muscle weakness of the upper and lower extremities. AR 815. There was muscle atrophy of the left thigh, swelling of the right knee and crepitus of the right shoulder. AR 815. Sitting and supine straight leg raising was positive bilaterally. AR 815. Plaintiff walked with an antalgic gait, limping on the left. AR 815. Percocet and Norco prescriptions caused drowsiness. AR 816.

Dr. Chan opined that Plaintiff could sit, stand or walk for less than one hour in an eight-hour workday. AR 816. She needed to elevate both legs six inches or less when she sat, and could sit for no more than thirty minutes before needing to get up. AR 817. She could not resume sitting for thirty minutes thereafter. AR 817. She could never, or rarely, lift any weight. AR 817.

///

Plaintiff required a single point cane to walk.  AR 817.  She was unable to walk at a reasonable pace on rough or uneven surfaces, use standard public transportation, carry out routine activities such as shopping and banking, or climb a few stairs at a reasonable pace.  AR 817.  Plaintiff was able to occasionally grasp, turn, twist or perform fine manipulations bilaterally and could never reach overhead.  AR 818.  Plaintiff lacked the strength and stamina to permit her to work in a competitive work environment without experiencing an increase of symptoms.  AR 818.  Her pain and fatigue would frequently interfere with attention and concentration, and she was likely to require 30-minute breaks every 15-20 minutes.  AR 818.  Dr. Chan concluded that Plaintiff was "totally disabled owing to her multiple problems."  AR 819.

### 3. Psychological Consultative Examination

Gil Schmidt, Psy.D., examined Plaintiff at the agency's request on September 28, 2013.  AR 544-50.  Dr. Schmidt found no severe mental health impairments.  AR 549-50.  Plaintiff does not challenge the ALJ's determination that Plaintiff had no severe psychological impairment.

### 4. Internal Medicine Consultative Examination

On September 28, 2013, internist Sarupinder Bhangoo, M.D., performed a consultative examination of Plaintiff.  AR 551-55.  Plaintiff reported that she injured her lower back and neck area in a fall at work, resulting in back pain that radiated into her legs.  AR 551.  Thereafter, she underwent a microdiscectomy, which did not significantly reduce her pain.  AR 551.  In 2009, Plaintiff injured her shoulder and neck area while lifting a heavy patient at work.  AR 551.  Her right shoulder rotator cuff tear was surgically repaired in December 2009, but she continues to experience pain and difficulty raising her right arm or picking up heavy objects.  AR 551.  Dr. Bhangoo questioned Plaintiff's representations of her own condition explaining that Plaintiff was capable of much more movement than she alleged.  AR 552.

Straight leg raising was negative.  AR 554.  Muscle bulk and tone was normal.  AR 554.  Motor strength was normal except for reduced right hand grip.  AR 554. No paravertebral muscle spasms, tenderness, effusions or deformities were observed.  AR 554.  There was decreased pinprick, touch and vibration sensitivity just below the right ankle joint.  AR 554.  Dr. Bhangoo summarized:

> The claimant gave a history that she hurt herself in the lower back in 2005 and then tore up her right shoulder in 2009 and underwent surgery. Her examination was somewhat difficult as she did not allow much of range of motion activities of right arm or neck, as well as the lower back area. There was an element of dramatization, as her pain was out of proportion to the range of motion attempted. It is also noted that Plaintiff did not have any muscle atrophy suggestive of nonuse of the right arm. It is also noted during her interview when the claimant seemed to be more relaxed and was able to use her arm, as well as bend from her back.

AR 554.

Dr. Bhangoo opined that Plaintiff could sit and walk for six hours in an eight-hour workday. AR 554. Her back injury limited her ability to bend and stoop, and her shoulder injury limited her ability to reach with her right arm. AR 554. Plaintiff was capable of normal and frequent crouching, handling, fingering, feeling and grasping with both hands. AR 554. Plaintiff was able to lift 20 pounds occasionally and ten pounds frequently. AR 555. She had no environmental, visual or communicative deficiencies and did not require any assistive device. AR 555.

### B.      Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews*, 53 F.3d at 1039-40.

///

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

### C. The ALJ's Determination of Plaintiff's Residual Functional Capacity

The ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except for the following limitations: "lift 20 pounds; can complete an 8 hour workday, if given the option to alternate between sitting and standing, as needed, in 30 minute increments; has frequent, but not constant, use of the hands and upper extremities; who can use the right upper extremity for reaching straight in front or lower but cannot reach above the shoulder; and who can do occasional bending and stooping." AR 37. In reaching that determination, the ALJ gave significant weight to Dr. Bhangoo's opinion since it was consistent with the mild findings in Plaintiff's imaging evidence and Dr. Bhangoo's observations of Plaintiff during the consultative examination. AR 39.

Despite the special significance to be afforded the opinion of a treating physician, which is entitled to controlling weight when supported by objective medical evidence and other substantial evidence of record, the ALJ gave less weight to Dr. Chan's three opinions because Dr. Chan's treatment notes indicated that he relied not on his observations, but on Plaintiff's representations to him that she could not sit, stand, or walk for long or lift more than five pounds. AR 39-40. The ALJ added:

///

> Dr. Chan did not perform the evaluative and objective testing methods administered by Dr. Bhangoo. Dr. Chan's opinions regarding the claimant's physical limitations ha[ve] not been provided substantial or controlling weight because they are based primarily on the claimant's subjective allegations and [are] not supported by his objective findings nor those of any other medical source. While the claimant has low back and right shoulder impairments they are not as limiting as proposed by Dr. Chan.

AR 40.

The ALJ found Dr. Chan's September 2012 opinion as conclusory and lacking specific limitations of function. AR 40. The evidence as a whole did not support either the September 2012 opinion or the April 2013 opinion, both of which relied primarily on Plaintiff's subjective reports and were not supported by the evidence as a whole. AR 40. Finally, the ALJ gave less weight to the April 2016 opinion since it was date more than a year after Plaintiff's last insured date (December 31, 2014), rendering it less relevant to Plaintiff's condition on that date. AR 40. In addition, the ALJ noted that:

> Dr. Chan bases his opinion of specific clinical findings such as sensory loss, muscle atrophy, trigger points, swelling, crepitus, bilateral upper extremity and lower extremity weakness, and an antalgic gait with left limp. However, although Dr. Chan notes these findings in his April 2016 opinion, his treatment evaluations do not mention such findings. Dr. Chan's treatment notes do mention cervical and lumbar tenderness, and positive impingement of the left shoulder, but make no mention of muscle weakness or abnormal gait, any swelling, crepitus, upper or lower extremity weakness, sensory loss, muscle atrophy, or trigger points.

AR 40.

The ALJ gave some weight to the conclusions of the state agency physicians who found no significant changes in Plaintiff's condition since the prior agency decision denying her application for disability benefits. AR 40.

## D.  The ALJ Properly Analyzed Evidence in the Record as a Whole

Examining physicians and non-examining physicians are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining

23

physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Such independent reasons may include laboratory test results or contrary reports from examining physicians and Plaintiff's testimony when it conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831 (citing *Magallanes*, 881 F.2d at 755).

The ALJ gave significant weight to the opinion of the consultative examiner Dr. Bhangoo. AR 39. He found that Dr. Bhangoo's opinion of Plaintiff's residual functional capacity was consistent with the mild findings in the imaging evidence and the doctor's observations of Plaintiff in the course of the examination. AR 39.

The ALJ acknowledged that because Dr. Chan was a treating physician, his opinion was entitled to "special significance" on the issue of the nature and severity of Plaintiff's impairment, and entitled to controlling weight if it is consistent with other substantial evidence in the record. AR 39. In a lengthy discussion, however, the ALJ explained why he gave less weight to Dr. Chan's three opinions. AR 39-40.

///

///

24

In general, the ALJ found that Dr. Chan determined Plaintiff's residual functional capacity by relying on Plaintiff's representations of her physical abilities rather than his own evaluations. AR 39. "Dr. Chan did not perform the evaluative and objective testing methods administered by Dr. Bhangoo." AR 40.

In his first opinion directed "to whom it may concern," Dr. Chan made no attempt to evaluate Plaintiff's ability to do work and provided nothing more than the conclusion that Plaintiff was completely disabled. The ALJ properly rejected the first opinion. The ultimate determination of disability is reserved to the Commissioner. *Allen v. Commissioner of Soc. Sec. Admin.*, 498 Fed.Appx. 696, 696 (9th Cir. 2012) (citing 20 C.F.R. § 404.1527(d)(1)-(d)(2)). "The ALJ need not accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas*, 278 F.3d at 957.

The ALJ found that nothing in Dr. Chan's treatment notes supported his second opinion (dated April 2013) that Plaintiff could sit, stand or walk no more than one hour in an eight-hour work day and lift no more than five pounds. AR 40. Dr. Chan's representation of the severity of Plaintiff's impairments found support only in Plaintiff's subjective representations of her condition, but was inconsistent with the record as a whole. AR 40.

Dr. Chan's third opinion provided a more detailed residual functional capacity assessment that Plaintiff could sit, stand or walk no more than one hour in an eight-hour work day; lift no more than five pounds; and needed to elevate her legs while sitting. AR 40. Although the opinion was tied to various specific clinical findings, most of those clinical findings were not set forth in Dr. Chan's treatment notes. AR 40.

An ALJ may reject a medical opinion that includes "no specific assessment of [the claimant's] functional capacity" during the relevant time period. *Johnson v. Shalala,* 60 F.3d 1428, 1432 (9th Cir.1995). An ALJ can disregard a medical report that does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity." *Morgan,* 169 F.3d at 601. An ALJ properly rejects medical opinions that fail to explain the extent or significance of a claimant's condition. *Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir.1999). In ///

short, an ALJ need not accept a medical opinion that is brief, conclusory, inadequately supported by clinical findings, or based on the claimant's noncredible testimony. *Thomas,* 278 F.3d at 957.

## IX.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Sherrill Lynn Eilers.

IT IS SO ORDERED.

Dated:    **June 10, 2019**                    **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE